UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHILLIP ANDREW SCOTT,

                    Plaintiff,                                 Hon. Paul L. Maloney

v.                                                 Case No. 1:21-cv-11

CITY OF BATTLE CREEK, et al.,

                    Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Phillip Scott has sued Defendants, the City of Battle Creek and Battle Creek Police Department (BCPD) employees Detective Ryan Strunk and Officer Michael Harrison, pursuant to 42 U.S.C. § 1983, alleging claims arising out of his arrest and prosecution for crimes that occurred on March 18, 2017. Scott alleges Fourth Amendment-based claims against Detective Strunk and Officer Harrison of false arrest and false imprisonment (Count I) and malicious prosecution (Count II) and a due process claim under the Fourteenth Amendment based on suppression of exculpatory evidence (Count III).[1] Scott also alleges a municipal liability claim against the City (Count IV). In addition to his federal claims, Scott invokes the Court's supplemental jurisdiction over his state-

---

[1] Scott's reliance on the Eighth Amendment in his false arrest and false imprisonment, malicious prosecution, and *Monell* claims is misplaced, as the Eighth Amendment only applies to individuals who have been incarcerated following a criminal conviction. *See Graham v. Connor*, 490 U.S. 386, 398–99 (1989) (noting that the "Eighth Amendment standard applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions'" (quoting *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40 (1977))); *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002) (noting that "[t]he Eighth Amendment applies to convicted prisoners"). Scott does not allege that he was a convicted prisoner at the time of his arrest or prosecution.

law claims of unlawful arrest (Count V), malicious prosecution (Count VI), false imprisonment (Count VII), and gross negligence (Count VIII).

Presently before the Court is Defendants' Motion to Dismiss. (ECF No. 7.) The motion is fully briefed and ready for decision. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Court **GRANT** Defendants' motion and dismiss Scott's complaint **with prejudice**.[2]

## I.   Background[3]

On the evening of March 18, 2017, Kamariah Hall went to the Omni Community Credit Union at 220 E. Roosevelt Avenue to withdraw money from the drive-up ATM machine. As Hall took the money from the machine, two black males armed with handguns and using towels to cover their faces approached her car from both sides, at the front driver's-side window and the passenger's-side window. The individuals pointed their handguns at Hall and directed her to withdraw the remainder of the money from her account, which amounted to $120. (ECF No. 1 at Page ID.3; ECF No. 8-2 at PageID.116.) After she did so, the individual on the passenger's side unlocked the passenger door and entered the car, and the individual on Hall's side opened the back

---

[2] Although Defendants have requested oral argument, I find that oral argument is unnecessary as the parties' briefs adequately develop the issues in contention.

[3] The factual recitation herein is based on the facts alleged in Scott's complaint, which are taken as true. In addition, when ruling on a Rule 12(b)(6) motion to dismiss, a district court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). In this case, such documents or records include the police/investigation report and surveillance video that Defendants have attached to their brief, *see Selby v. Schroeder*, 522 F. Supp. 3d 388, 395 (M.D. Tenn. 2021); *MCRS, Inc. v. Etue*, No. 11-14590, 2012 WL 666836, at *2 (E.D. Mich. Feb. 29, 2012), as Scott refers to those items in his complaint, and the transcript of the January 24, 2018 preliminary examination, as it is a public record of court proceedings. *See Roberts v. Jon Doe Delta Cnty. Prosecutor*, No. 2:19-CV-23, 2019 WL 3890215, at *2 (W.D. Mich. Aug. 19, 2019) (noting that a transcript of a preliminary examination is a public record for purposes of a motion to dismiss) (citing *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010)).

door and sat behind Hall. (ECF No. 1 at PageID.3–4.) The individual seated next to Hall inserted his handgun into Hall's mouth, and the individual behind her put his handgun to her head and instructed her to drive away from the credit union. Hall complied, and the same individual directed her to drive to Hubert Street and Gardenia Street— a dead-end road—and not to look at any street signs. When they arrived at the dead-end road, the individuals exited Hall's vehicle and instructed her to drive away. (*Id.* at PageID.4.)

After Hall left the area, she was unable to call the police because she did not have her cell phone. She thus drove to her father's house and told him about the incident, and he contacted the police. By that time, BCPD officers had been dispatched to the credit union in response to a call from a witness who had observed the robbery. (*Id.*) After speaking with Hall's father, BCPD officers contacted Hall at her father's home to interview her about the incident. Officer Harrison, who prepared the Incident Report, wrote that Hall described the first suspect as "a b/m, approx. 6'2", 200 lbs., wearing a black or dark gray shirt or hoodie with a white towel or shirt wrapped around his face," and the second suspect as "a b/m, approx. 5'10", with a small build, wearing a dark colored t-shirt or hoodie and was also wearing a towel or t-shirt tied around his face." (*Id.* at PageID.5; ECF No. 8-1 at PageID.84.)

After speaking with Hall, BCPD officers searched the area of Hubert and Gardenia Streets with a K9 unit and located a black hoodie sweatshirt and a pink towel matching Hall's description of the perpetrators' clothing/face coverings. They also searched Hall's car for fingerprints and took buccal swabs for DNA. No fingerprints were found, but the swabs were submitted for DNA testing along with the hoodie sweatshirt and the towel. (*Id.* at PageID.6; ECF No. 8-1 at PageID.89–90.)

On August 9, 2017, Officer Harrison submitted a supplemental report stating that the case was closed because the submitted items did not produce a DNA match and there were "no known

suspects." (ECF No. 1 at PageID.6; ECF No. 8-1 at PageID.91.) On September 7, 2017, Officer Harrison prepared another supplemental report stating that he had "received a CODIS [Combined DNA Index system] hit back from the black sweatshirt collected during the investigation," which matched to Scott. Officer Harrison indicated that he would be submitting a DNA warrant for Scott to the prosecutor's office. (ECF No. 1 at PageID.6; ECF No. 8-1 at PageID.92.) Officer Harrison obtained a warrant on September 8, 2017. On September 10, 2017, BCPD officers executed the warrant after stopping Scott for a traffic violation and obtained two buccal swabs containing Plaintiff's DNA. (ECF No. 1 at PageID.6–7; ECF No. 8-1 at PageID.94.)

On January 3, 2018, Detective Strunk issued a supplemental report stating that the Michigan State Police Forensic Science Division report, received on January 2, 2018, indicated that the swabs from the black sweatshirt and the pink towel contained DNA from Scott and "three unrelated unknown individuals." Detective Strunk also stated that, based on the DNA report, Scott had been identified as the male sitting behind Hall, as he was the only suspect wearing a black shirt/sweatshirt and that an arrest warrant for Scott would be submitted to the prosecutor's office for several charges, including armed robbery and weapons violations. (ECF No. 1 at PageID.7; ECF No. 8-1 at PageID.95.)

On January 4, 2018, Detective Strunk issued another supplemental report indicating that he spoke to Hall on January 1, 2018, and advised her that they had identified one of the suspects. Detective Strunk also wrote that he asked Hall for details she could recall about the suspects, and she stated that "the male in the dark/black sweatshirt ha[d] a tattoo with flames on one of his hands." He further noted:

> HALL thought that there was possibly some writing in the middle of the tattoo, but was not sure. This would've been the male that approached her vehicle on the drivers side. I was able to locate the scars, marks, and tattoos listed in the Battle

Creek Police Records Management System and it shows him to have a skull tattoo with flames on his right arm.

(ECF No. 1 at PageID.7–8; ECF No. 8-1 at PageID.96.) This report was the first time a tattoo on either suspect's hand had been noted in any report. The surveillance video of the ATM machine at the credit union showed that the individual who entered the back seat of Hall's car was wearing a long sleeve sweatshirt, and his forearm was never revealed to Hall.[4] (ECF No. 1 at PageID.8.)

On January 3, 2018, Detective Strunk submitted a warrant request to the Calhoun County Prosecutor's Office for charges against Scott. Scott was arrested on January 8, 2018, and a criminal complaint charging him with numerous felonies was filed the same day. (*Id.* at PageID.9–10.) A preliminary examination was held on January 24, 2018, to determine whether probable cause existed. During the hearing, Hall testified that the suspect who sat in the front passenger seat of her car had a tattoo on one of his hands. At the conclusion of the hearing, the district court judge determined that probable cause existed to believe that the charged offenses had been committed and that Scott was the individual who committed them, based on the fact that Scott's DNA was on the items recovered during the investigation and Hall's testimony that one of the suspects had a tattoo on his right hand. Scott has a tattoo of a skull with flames on his right wrist and mid-arm. (*Id.* at PageID.9.)

On November 6, 2018, the case was tried to a jury. A mistrial was declared after the jury was unable to reach a verdict. A second trial was held in August 2019, which resulted in not-guilty verdicts on all charges against Scott. (*Id.* at PageID.10–11.)

---

[4] Scott alleges in paragraph 49 of his complaint that the video shows that the individual who entered the back seat of Hall's car was wearing a long-sleeve sweatshirt and his wrist and forearm were never revealed to Hall. (ECF No. 1 at PageID.8.) However, this allegation is not entirely accurate. Clip 1 of the video shows that at approximately 9:54:49, the suspect's wrist would have been exposed to Hall for at least a brief period of time as he moved toward her car. Moreover, during the time the suspect remained at Hall's car window, his back was to the camera, and it cannot be determined whether or not his right wrist was exposed to Hall during that time.

## II.   Motion Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating its assertions in a light most favorable to Plaintiff to determine whether it states a valid claim for relief. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court has held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678-79.

## III.   Discussion

Defendants cite a number of grounds in support of their motion to dismiss, but I conclude that three grounds, in particular, adequately dispose of Scott's claims, rendering consideration of the remaining grounds unnecessary. First, the doctrine of collateral estoppel precludes Scott from relitigating the state court's probable cause determination, and because lack of probable cause is an element of Scott's federal-law false arrest/imprisonment and malicious prosecution claims and his state-law unlawful arrest, malicious prosecution, and false imprisonment claims (Counts I, II,

V, VI, and VII), those claims fail as a matter of law.[5] Second, Scott fails to state a *Monell* claim against the City. Finally, Scott's gross negligence claim is subject to dismissal as it is based on the same facts as his intentional tort claims of unlawful arrest, malicious prosecution, and false imprisonment.

Before turning to these issues, I note that Scott has failed to respond to Defendants' argument that his due process claim in Count III based on suppression of exculpatory evidence fails because Scott was found not guilty in the criminal case. (ECF No. 60–61.) Scott also failed to respond Defendants' argument that they are entitled to absolute immunity under both federal and Michigan law for liability based on testimony that they gave during the criminal trials. (*Id.* at PageID.67–69.) Given these circumstances, Scott is deemed to have waived any opposition to these arguments. *See Humphrey v. U.S. Att'y Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (finding that the plaintiff had waived any arguments he had in opposition to the defendant's motion to dismiss by not responding to the motion); *Scott v. Tennessee*, 878 F.2d 382 (6th Cir. 1989) (affirming the district court's grant of the defendant's unopposed motion to dismiss and noting that "if a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion"); *Thorn v. Medtronic Sofamor Danek, USA, Inc.,* 81 F. Supp. 3d 619, 631 (W.D. Mich. 2015) (noting that the plaintiff had "fatally" failed to oppose the defendants' arguments).

---

[5] Because lack of probable cause is integral to all of these claims, I recommend that, in its discretion, the Court exercise supplemental jurisdiction over Scott's state-law claims. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620 (6th Cir. 1999) ("[D]istrict courts have 'broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims.'") (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996)).

In any event, Count III is subject to dismissal on the merits as the Sixth Circuit has held that a due process claim based on a *Brady* violation fails where, like here, the underlying criminal proceeding terminated in the plaintiff's favor, thus precluding any injury from wrongful suppression of exculpatory evidence. *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988). For this reason, Count III should be dismissed. Similarly, Scott's claims are barred by absolute witness immunity to the extent they rely on testimony Defendants gave during Scott's criminal trial. *See Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) (noting that in a case under Section 1983, "a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony" (citing *Briscoe v. LaHue*, 460 U.S. 325, 332–33 (1983)); *Maiden v. Rozwood*, 461 Mich. 109, 134 (1999) (noting that "witnesses who testify during the course of judicial proceedings enjoy quasi-judicial immunity" that renders them "wholly immune from liability for the consequences of their testimony or related evaluations" (internal quotation marks omitted)). Witness immunity is particularly fatal to the claims against Officer Harrison, as Scott alleges no fact indicating that Officer Harrison played any part in procuring the arrest warrant, and his trial testimony provides the only *possible* basis for any alleged wrongdoing. (ECF No. 1 at pageID.11.) Accordingly, I recommend that the Court dismiss all claims against Officer Harrison on this ground.

One additional issue—Scott's request for discovery pursuant to Federal Rule of Civil 56(d)—merits attention. In his response, Scott asserts that "[c]ourts must give the parties 'a reasonable opportunity to present all material that is pertinent to the [summary judgment] motion.'" (ECF No. 14 at PageID.199 (quoting Fed. R. Civ. P. 12(d)).) Scott's argument fails, however, because Defendants have not filed a motion for summary judgment and are not asking the Court to consider matters outside the pleadings, as the investigation reports, preliminary

examination transcript, and surveillance video are all matters that are properly considered in deciding the present motion to dismiss. *See* n. 3, *supra*. Thus, the Court has no reason to convert the motion to a motion for summary judgment. Moreover, to the extent Scott seeks discovery to defend the present motion, the Sixth Circuit has squarely rejected the notion that a plaintiff is entitled to discovery before responding to a motion to dismiss. *See Kolley v. Adult Prot. Servs.*, 725 F.3d 581, 587 (6th Cir. 2013) ("A plaintiff is not entitled to discovery before a motion to dismiss, and dismissal under Rule 12(b)(6) helps protect defendants from expending resources on costly discovery for cases that will not survive summary judgment.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558–59 (2007)). Moreover, the Supreme Court has directed district courts not to "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

### A.    Collateral Estoppel

Defendants contend that the state-court's probable cause determination is entitled to preclusive effect in this action and precludes Scott from establishing both his federal and state-law claims. Lack of probable cause is an element of false arrest/imprisonment and malicious prosecution claims under federal law. *See Sykes v. Anderson*, 625 F.3d 294, 305, 308–09 (6th Cir. 2010) (false arrest and malicious prosecution); *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (false arrest); *Hardesty v. City of Ecorse*, 623 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (false arrest and imprisonment). The same is true for such claims under state law. *See Walsh v. Taylor*, 263 Mich. App. 618, 626–27 (2004); *Burns v. Olde Discount Corp.*, 212 Mich. App. 576, 581 (1995).

"Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 817 (6th Cir. 2010) (quoting *Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir. 2007)). The Sixth Circuit

has held that "[w]here a party has had a full and fair opportunity to litigate an issue in earlier state proceedings, he is precluded from relitigating the same issue in a later federal case." *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) (internal quotation marks omitted), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001). In *Coogan*, the court held that because the plaintiff had contested the issue of probable cause at his preliminary examination and had the right to call witnesses and cross-examine the state's witnesses, the plaintiff was foreclosed from relitigating probable cause in a subsequent Section 1983 action. *Id.* As the Sixth Circuit has noted:

> The law of our Circuit provides that where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.

*Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) (citing *Coogan*, 820 F.2d at 175).

Under Michigan law, collateral estoppel applies when (1) there is an identity of parties across the proceedings, (2) there was a valid, final judgment in the first proceeding, (3) the same issue was actually litigated and necessarily determined in the first proceeding, and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 434 Mich. 146, 154–57 (1990)). Michigan courts have applied collateral estoppel to bar relitigation of an issue in a civil case that was determined in a prior criminal trial. *See Webb v. City of Taylor*, No. 236153, 2002 WL 31947931, at *4 (Mich. Ct. App. Dec. 3, 2002). Moreover, Michigan courts have held that mutuality is not required when collateral estoppel is used defensively. *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 691–92 (2004).

There is no question that the first two elements for collateral estoppel are satisfied.[6] As for the remaining elements, probable cause was an issue in the underlying state criminal proceeding; the issue was actually and necessarily litigated; and Scott had a full and fair opportunity to litigate the issue by cross-examining the prosecution's witnesses, including Hall. (ECF No. 8-2.) At the conclusion of the hearing, District Judge Durham found that the prosecution's evidence satisfied the probable cause standard. (*Id.* at PageID.170–72.)

Citing *Darrah*, Scott argues that the prior determination does not estop him from litigating probable cause because the issues being litigated in this action are not identical to the issues raised at the preliminary examination. The *Darrah* court declined to apply collateral estoppel to the state court's probable cause determination because it did not address the issue the plaintiff asserted in his Section 1983 claim—"whether Officer Bragg made materially false statements to the state judge that formed the basis of that court's probable cause determination." 255 F.3d at 311. The court's holding in *Darrah* thus stands for the proposition that "[t]o the extent that a plaintiff in a § 1983 cause of action can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's probable-cause determination, there is no requirement that the initial finding be given preclusive effect in the federal-court action." *Autrey v. Stair*, 512 F. App'x 572, 579 (6th Cir. 2013).

Scott points out that, at the time Detective Strunk received the DNA test results on January 2, 2018, which identified Scott's and three other unknown individuals' DNA on the black sweatshirt and towel, Scott had already been identified as a potential suspect through the CODIS hit in September 2017. He asserts that the fact that Hall did not mention a tattoo on the suspect

---

[6] *See Buttino v. City of Hamtramck*, 87 F. App'x 499, 505 n.4 (6th Cir. 2004) (noting that Michigan courts have held that identity of parties exists when the first suit was a criminal action and the second suit is a civil action).

until Detective Strunk interviewed her on January 1, 2018 (as described in the January 4, 2018 supplemental report), when he told her that a suspect had been identified, raises "several significant questions" regarding her identification of a tattoo on the suspect's hand and the point at which she informed Officer Harrison or Detective Strunk about the tattoo. (ECF No. 14 at PageID.203–04.) Scott asserts that Detective Strunk sought a warrant for Scott's arrest based, in part, on details from Hall that he knew were inaccurate because he knew that the perpetrator wore a long-sleeve sweatshirt that covered his arm and that Scott's tattoo was on his arm instead of his hand. (*Id.* at PageID.204.) Scott asserts that the numerous inferences arising from these facts demonstrate that he "has sufficiently alleged that Defendant Strunk lacked probable cause to arrest [him]." (*Id.*)

The issue before the Court is not whether probable cause existed, for the state court has already ruled on that question. Nor does it matter whether Detective Strunk could have conducted a more thorough or detailed investigation before seeking an arrest warrant. Rather, the only inquiry at this juncture is whether Detective Strunk made a materially false statement that the state court relied on for its probable cause determination or whether he withheld materially exculpatory evidence. *Autrey*, 512 F. App'x at 579. Although Scott alleges that Detective Strunk made false statements, his own factual allegations undermine this assertion. First, it is undisputed that Detective Strunk noted the discrepancy between Hall's identification of a tattoo with flames on a suspect's hand and the actual location of Scott's tattoo on his "right arm" in his January 4, 2018 supplemental report. (ECF No. 1 at PageID.7–8; ECF No. 8-1 at PageID.96.) Second, while Detective Strunk did testify during the preliminary examination—as did the officer in *Darrah*— his testimony was limited to his interview of Scott after he was arrested. (ECF No. 8-2 at PageID.142–44.) Moreover, the judge did not rely on Detective Strunk's testimony to support his probable cause ruling. (*Id.* at PageID.169–71.) *See Bach v. Drerup*, 545 F. App'x 474, 477 (6th

Cir. 2013) ("Although Walls's statements led Defendants to arrest Bach and to the Walgreens employee's subsequent identification of Bach in the photographic lineup, the state court relied only on the employee's identification of Bach in finding probable cause.").

As for withholding of evidence, Scott asserts that Detective Strunk made omissions that misleadingly created the impression that Hall had identified a tattoo on a suspect's hand that implicated Scott as a perpetrator, (ECF No. 1 at PageID.12), but he fails to provide facts supporting this assertion. For example, he does not allege that Detective Strunk hid the discrepancy between Hall's identification and the actual location of Scott's tattoo from the prosecutor, or that he withheld the surveillance video from the prosecutor. More importantly, the tattoo, and its location, were front and center during the preliminary examination. Hall testified that although she did not get a good look at the suspects, she said that they had towels wrapped around their faces and were wearing hoodies, or sweatshirts. (ECF No. 8-2 at PageID.114.) She also said that she noticed the individual in the front passenger's seat had a tattoo of a skull with wings or flames. (*Id.* at PageID.115.) Hall also said that she told the police everything she knew about the situation, including that she had seen a tattoo. (*Id.* at PageID.118, 125–26.) During the hearing, Scott interjected that his tattoo was on his arm and not his hand. (*Id.* at PageID.126–27.) Near the end, the prosecutor asked the judge to take note of Scott's tattoo. As Scott displayed his arm, he commented to the judge, "This is about my forearm. She said my hand, so that's a grave difference." (*Id.* at PageID.164.) Thus, the judge—as well as Scott and his counsel—had all the evidence needed to ascertain that Scott's tattoo might not have been visible to Hall, including Scott's display of the location of his tattoo and Hall's testimony that the suspects were wearing hoodies, which are commonly understood to be long sleeve sweatshirts. Moreover, the surveillance video is not as definitive as Scott claims. Scott admits that he has a tattoo on his right *wrist* and

13

forearm. He alleges that the video shows that the individual who stood on Hall's side of the car was wearing a long sleeve sweatshirt and his wrist and forearm were never revealed to Hall (ECF No. 1 at PageID.8 –9), but that is not entirely true. The only helpful video angle clearly shows the suspect's right wrist exposed at one point, and does not negate the possibility that it continued to be exposed while the suspect was facing Hall with his back to the camera.[7]

Scott cites *Broadnax v. Double*, No. 2:12-CV-12744, 2013 WL 5353243 (E.D. Mich. Sept. 24, 2013), as authority for denying Defendants' motion to dismiss, arguing that the court in *Broadnax* determined that under the totality of the circumstances, genuine issues of material fact remained as to the existence of probable cause. As noted above, however, collateral estoppel, not probable cause, is the issue Defendants raise in their motion. The *Broadnax* court considered collateral estoppel, but found that it did not apply because the defendant intentionally withheld video evidence from the prosecutor that contained additional camera angles that the prosecutor deemed exculpatory once he received them from the defendant. *Id.* at *2, 6. There is no factual allegation or evidence in this case that Detective Strunk engaged in similar conduct.

Accordingly, I recommend that the Court dismiss Counts I, II, V, VI, and VII on the ground that Scott is collaterally estopped from relitigating the state-court's probable cause finding.

**B.**   ***Monell* Claim**

In Count IV, Scott alleges a claim of municipal liability against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A municipality may only be liable under

---

[7] It is also worth noting that, while the judge mentioned the tattoo evidence and described it as "relevant probable cause evidence," he found that the "stronger evidence is the DNA testing in this case." (ECF No. 8-2 at PageID.170.) After describing the DNA results for both the black sweatshirt and the pink towel, he concluded: "Basically, that's very strong support, clearly by a probable cause standard, that the defendant was, in fact, the person who was wearing the pink towel and was also wearing the black sweatshirt and was, in fact, the person who . . . committed those eight felonies." (*Id.* at PageID.170–71.)

Section 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 39 (2010) (citing *Monell*, 436 U.S. at 694). In a municipal liability claim, the finding of a policy or custom is the initial determination to be made. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

Defendants contend that the *Monell* claim fails because it consists solely of labels and conclusions without any supporting facts. "Conclusory assertions [of a policy or custom] are not enough to state a *Twombly* plausible *Monell* claim." *Rayfield v. City of Grand Rapids*, 373 F. Supp. 3d 962, 977 (W.D. Mich. 2018). Although the argument has merit, I need not address it because collateral estoppel precludes the underlying claims that provide the basis for the *Monell* claim. *See Spencer v. County of Huron*, 717 F. App'x 555, 559 (6th Cir. 2017) ("We have already found that collateral estoppel precludes Spencer from arguing that his Fourth Amendment rights were violated, which would be the basis of his *Monell* claim. Therefore, Spencer's *Monell* claim fails.").

Accordingly, I recommend that Count IV be dismissed.

### C.     Gross Negligence

Defendants also contend that Scott's gross negligence claim fails because his state-law claims of false arrest and imprisonment and malicious prosecution are intentional torts. Michigan courts have held that "[e]lements of intentional torts may not be transformed into gross negligence claims." *Norris v. Lincoln Park Police Officers*, 292 Mich. App. 574, 582 (2011) (citing *VanVorous v. Burmeister*, 262 Mich. App. 467, 483 (2004)). When a claim of gross negligence is premised on conduct amounting to an intentional tort, the gross negligence claim is properly

15

dismissed. *See Smith v. Stolberg*, 231 Mich. App. 256, 258–59 (1998) (holding that the trial court properly granted summary disposition on the plaintiff's negligence claim because the plaintiff alleged "an intentional, offensive touching" that amounted to the intentional tort of battery rather than negligence). Scott's false arrest/imprisonment and malicious prosecution claims are intentional torts. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 254 (6th Cir. 2010) (citing *Odom v. Wayne Cnty.*, 482 Mich. 459 (2008)). The basis for Scott's gross negligence claim is his allegation that Detective Strunk made false statements or omissions that Hall had identified a tattoo that would identify Scott as a perpetrator of the crimes. (ECF No. 1 at PageID.26.) Because this is the same factual basis upon which Scott's intentional torts depend, his gross negligence claim is properly dismissed. *See Hill v. City of Detroit*, No. 348798, 2021 WL 137381, at *2 (Mich. Ct. App. Jan. 14, 2021) (holding that the plaintiff's gross negligence claim was properly dismissed because it "relied on the same 'wrongful conduct' as his intentional tort claims [of false arrest/imprisonment and malicious prosecution]" and thus "his gross negligence claim was 'fully premised' on his intentional tort claims").

Accordingly, Scott's gross negligence claim should be dismissed.

### III.  Conclusion

For the foregoing reasons, I recommend that the Court **grant** the Defendants' motion to dismiss (ECF No. 7) and dismiss Scott's complaint **with prejudice**.

Dated: November 17, 2021                                    /s/ Sally J. Berens
                                                                   SALLY J. BERENS
                                                                   U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order. *See*

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).